IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| DIERDRE M. STANDHARDT, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action |
| ) | No. 10-3535-CV-S-JCE-SSA |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| Defendant. ) | |

## ORDER

This case involves the appeal of a final decision of the Secretary denying plaintiff's application for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq., and her application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 et seq. Pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), this Court may review the final decisions of the Secretary. Pending before the Court at this time are plaintiff's brief, and defendant's reply brief in support of the administrative decision. For the reasons stated herein, the Secretary's decision will be affirmed.

Standard of Review

Judicial review of disability determination is limited to whether there is substantial evidence in the record as a whole to support the Secretary's decision. 42 U.S.C. § 405(g); e.g., Rappoport v. Sullivan, 942 F.2d 1320, 1322 (8th Cir. 1991). Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)). Thus, if it is possible to draw two inconsistent positions from the evidence and one

position represents the Agency's findings, the Court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

In hearings arising out of an application for benefits, the claimant has the initial burden of establishing the existence of a disability as defined by 42 U.S.C. §§ 423(d)(1). Wiseman v. Sullivan, 905 F.2d 1153, 1156 (8th Cir. 1990). In order to meet this burden, the claimant must show a medically determinable physical or mental impairment that will last for at least twelve months, an inability to engage in substantial gainful activity, and that this inability results from the impairment. Id. A disabling impairment is one which precludes engaging "in any substantial gainful activity [for at least twelve months] by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A finding of "not disabled" will be made if a claimant does not "have any impairment or combination of impairments which significantly limit [the claimant's] physical or mental ability to do basic work activities. . . ." 20 C.F.R. § 404.1520.

The standard by which the ALJ must examine the plaintiff's subjective complaints of pain is well-settled. The ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as the claimant's daily activities, the duration and frequency of pain, precipitating and aggravating factors, dosage and effects of medication, and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

## Discussion

Plaintiff was 49 years old at the time she applied for disability benefits. She alleges disability due to arthritis, curvature of the spine, depression, high blood pressure, a history of spinal meningitis, and borderline personality disorder.

The ALJ found that plaintiff had not engaged in substantial gainful activity since June 1, 2006, the alleged onset date. It was his finding that plaintiff had the following impairments, which, in combination, are severe: "Depression; borderline personality disorder; bipolar affective disorder; alcohol abuse, on-going; arthritis; hypertension; obesity; chronic obstructive pulmonary disease; tendonitis/tendonopathy, right foot; nicotine abuse; and fibromyalgia." [Tr. 13]. He found that her allegations of curvature of the spine, history of spinal meningitis with dementia, right shoulder bursitis, tarsal tunnel syndrome, and plantar fasciitis, were not severe. The ALJ concluded that she did not have an impairment or combination of impairments that met or equaled a listed impairment. It was also the ALJ's finding that plaintiff was only partially credible. He found that she had the Residual Functional Capacity ["RFC"] to perform medium work with certain non-exertional limitations. "She is limited to work involving no more than occasional contact with the public. She has marked limitation of the ability to perform skilled work. With regard to the ability to make judgments on complex work-related decisions, she is limited to occasionally making executive decisions (i.e., decisions on how to perform or complete a job) based on discussions with others at the same job skill level." [Tr. 14]. It was the ALJ's conclusion that plaintiff could perform her past relevant work as a school cafeteria cook, a home health aide, a meat wrapper, and a kitchen helper. Therefore, the ALJ found that plaintiff was not under a disability as defined by the Act.

At the hearing before the ALJ, held on January 23, 2010, plaintiff testified that Dr. Hopkins was her family doctor and treating physician, whom she had seen for five years. She saw him the week before the hearing for a follow-up on her fibromyalgia. On a regular basis, she also sees a rheumatologist, whom she saw two weeks before the hearing. He also did a follow-up for fibromyalgia, suggesting that she do some simple stretching exercises to relieve muscle

tension. She previously went to a podiatrist in 2009, who suggested she see a neurologist for tarsal tunnel syndrome. She could not keep that appointment because she had a panic attack. For her mental health, plaintiff testified that she has been seeing Ms. Wilczynski, who is a nurse practitioner, for two years. She has problems with panic attacks. Plaintiff stated that she has consistently sought mental health treatment for the past seven years. The appointments are 30 to 45 minutes, and involve some discussion and a medication adjustment if needed. She also goes to a mental health service and sees a social worker. This started with therapy for her son, and is now complete family therapy. Although surgery was discussed for her Achilles tendon problem, it was eventually deemed not to be necessary. Now the focus is on the tarsal tunnel. Plaintiff testified that the biggest factor in her not being able to work is that she doesn't get along well with other people. She has memory problems and panic attacks. "Simple tasks take a big effort in my life." [Tr. 35]. She gets into arguments with people because of the way something is said and the way she interprets it. Plaintiff estimated that she has verbal arguments about every 20 minutes with someone. She is overly sensitive, and has had problems in the past dealing with coworkers or supervisors. She never lost a job because of an argument, but has left a job because she had a panic attack. These occur about six times a month. Mainly, they occur because of the overly-sensitive way that she perceives a situation. Physically, she shakes all over and has to lie down. She has to isolate herself from any sound and does deep breathing. The attack may go on for hours. Plaintiff stated that she'd been diagnosed with bipolar disorder and that she takes a lot of medication for that and for panic and anxiety. She takes medication on a regular basis, and does not have any side effects, with the exception of "brain fog." [Tr. 38]. She testified that when she has the brain fog, she forgets things, such as going into a room and forgetting what she is there for. She also gets confused easily. This goes on 99.9 % of the time. When she lies down

because of a panic attack, it might be two to three hours before she feels herself calming down. She is physically and emotionally exhausted afterwards. Plaintiff also testified that she did not feel confident that she could go into the workforce and do an adequate job. Her energy level is very low, and she estimated that she rests six hours in an eight-hour day. She has a hard time concentrating when she reads, and is unable to read a book. She can sometimes watch television and follow the story.

In terms of physical problems, plaintiff testified that she has pain in her feet, knees, joints, ligaments in her legs, her hips, lower back, upper neck, in her shoulders, and in the digits of her fingers. She relates this pain to her fibromyalgia. The pain feels constraining, like a blunt object is hitting her in each joint, and happens daily. It is helped by medication, but does not go away. She does not have side effects from the medication. Carrying a gallon of milk ten feet exhausts her, and hurts in her elbows and shoulders. She has trouble going out in public, so her husband usually does the grocery shopping. She cannot sit longer than 20 minutes at a time. She also can only stand twenty minutes to half an hour. She can't alternate during the day because she cannot pace herself regarding needing to sit down or get up. It may take her two hours to do the dishes. She wouldn't be able to walk a block. She might have to rest the remainder of the day, into the next day, before being able to walk again. She cannot bend from the waist, and cannot do things like pick up clothes out of the dryer. She is losing her grip on things, including even holding a cup of coffee. Plaintiff testified that she recently shook so badly that she spilled coffee all over the counter. She can't hold onto things for longer than three to five minutes. She has a daily problem with shaking, which also affects her writing. She also can't write for more than ten minutes because she gets too distracted. In terms of household chores, plaintiff testified that if she vacuums four rooms, she cannot do anything the rest of the day. She can only do one load of

laundry daily. If she cooks dinner, she can't do the dishes until the next day. She has some problems forgetting ingredients. Plaintiff testified that she has an eleven-year old son at home, whom she takes care of. She is able to drive, and drives him to school three days a week. She drove herself the 68 miles to the hearing, but her sister was going to have to drive her home. She can't sit behind the steering wheel for that long. Plaintiff stated that they had to stop three times on the way to the hearing because of her feet, and so she could get out and stretch. It was her testimony that she cannot go to her son's extracurricular activities because she can't handle crowds; she feels like everyone is staring at her. She did attend a parent-teacher conference with no problem. She has problems making friends. Plaintiff testified that she has problems sleeping longer than four hours at a time because her hips and sides hurt, and she has to get up and walk around for about 30 minutes. She has trouble going back to sleep, and does not wake up feeling rested.

Regarding alcohol use, plaintiff stated that she drinks three beers about once a month. She acknowledged that she used to be a heavy drinker of hard alcohol. She was drinking every day. She quit doing that six or seven years ago when she started going to counseling. She only drinks on social occasions, and that is mainly around family. She did not go to AA. Plaintiff testified that her mental functioning is about the same since she has stopped drinking. Doctors and counselors have advised her to completely stop drinking. Plaintiff stated that she made better decisions when she wasn't drinking. She tries to be more focused on her health or on helping others rather than hurting them. She admitted that alcohol affected her relationships with people, particularly her children. She didn't think the alcohol affected her at work because she usually drank after work. Plaintiff testified that she still has anxieties and fears without alcohol, and has problems functioning. She thought the alcohol was more of a physical and mental health issue.

The medical expert, Dr. Lorber, from the Indianapolis Bone and Joint Clinic, also testified telephonically in this case. Because the doctor's call disconnected during part of the hearing, plaintiff was asked again about her ability to bend from the waist. She said she thought she could periodically bend for about two hours to do simple tasks. It was her testimony that she normally does the household chores, including cooking, laundry, and dishes on occasion. She stated that she cannot finish a task like the laundry without interruptions because of physical and mental problems. Running the vacuum makes her entire body hurt, and if she vacuums the four rooms in her house, she is finished for the day. She has to stop every 15 minutes. It takes her an hour to vacuum one room, and that is not a thorough job. She also stated that she couldn't attend her son's activities because of pain, as well as anxiety. In terms of her drinking, she quit being a heavy drinker of hard liquor about 21 years ago, when she had children. Before she limited herself to a few occasional beers, six or seven years ago, she drank about a six-pack of beer on a daily basis. In terms of the problems with her feet, plaintiff testified that her toes have a tendency to curl down. She has to wear inserts in her shoes. Her right ankle is swollen and weak. She has no tendons on her left ankle. She can't fully flex her left foot. Standing and walking hurts in her ankle joints and up into her calves. The ankle pain is more of a problem walking than the fibromyalgia. In her right foot, she has numbness and constant burning. On a one-to-ten pain scale, she would rate that pain as a ten. Her normal level of pain is an eight. She doesn't feel stable, and relies more on her right foot. She uses a cane when she walks, although no doctor prescribed it for her. She uses it for walking a certain distance, like twenty minutes, or when the weather is bad. It was her testimony that she uses a cane as a stabilizer, and has been doing so for about two years. Plaintiff testified that until about a year ago, she cared for her mother-in-law. She did this for about three years until she died. Her mother-in-law had cancer, and plaintiff

provided care in terms of feeding, bathing, mobility, and getting her in and out of bed.

The medical expert testified regarding plaintiff's ankle problems. He noted that she had injections in her right ankle for tendonopathy. When the podiatrist suggested surgery on the tendon, plaintiff's symptoms resolved. The expert opined that the Achilles tendonopathy had resolved after the injections. The medical expert also disputed the podiatrist's possible diagnosis of tarsal tunnel syndrome. "The idea that she has some absent tendon is not supported anywhere in the records." [Tr. 80]. Therefore, he found that she did not meet or equal any listed impairment because of her feet. In terms of her spine and her claim of scoliosis, he found no evidence of neurologic deficit involving her lower extremities. The expert also found that she did not meet or equal a listed impairment regarding COPD, and noted that she continued to smoke half a pack of cigarettes a day. She had full range of motion in her shoulders, and did not meet or equal a listed impairment. Regarding plaintiff's claim that she had spinal meningitis at 18 months of age, which left her with weakness on the left side of her body, there was no evidence of neurologic deficit on the left side of her body. Therefore, he found that she neither met nor equaled any listing regarding physical impairments, although she might have psychiatric issues that he could not address because that was not his area of expertise He concluded that she could perform a medium level of activities with no restrictions. He was asked about her complaints of burning on the bottom of her foot, but stated that he found no evidence of peripheral neuropathy. The medical expert rendered the opinion that plaintiff embellished and "pretty much endorses any symptoms that are proposed. . . ." [Tr. 83]. Regarding Dr. Hopkins' opinion in his Medical Source Statement-Physical ["MSS-P"] that plaintiff can do no handling, fingering or feeling, the medical expert stated that he found nothing in the record to support this. Dr. Lorber also testified that there may be some embellishment of physical symptoms because of a mental disorder, or

somatization.

According to the testimony of a vocational expert, plaintiff could perform her past relevant work, including work as a school cafeteria cook, home health aide, meat wrapper, and kitchen helper. This was based on an RFC to perform the full range of medium work, with the non-exertional limitations found to be credible by the ALJ. If the hypothetical were changed to include only light work, the expert testified that there would be no past work that plaintiff could perform, but that other work existed. This included small products assembler, press operator and core extruder.

Plaintiff contends that the ALJ erred in his credibility determination, including not properly considering the opinions of treating physicians, and that he failed to fulfill his duty by failing to order a consultative examination in this case regarding three factors: An EMG-nerve conduction test; a mental evaluation to determine a somatoform disorder; and fibromyalgia testing.

Plaintiff complains that the ALJ failed to fulfill his duty by failing to order a consultative examination in this case regarding a nerve conduction test, a mental evaluation to determine a somatoform disorder, and fibromyalgia testing. She contends that her attorney made a post-hearing request, on March 15, 2010, for this additional testing. She asserts that this was done because the medical expert mentioned that there was not enough evidence to determine whether these conditions existed. She contends that the ALJ gave great weight to the opinion of the medical expert, and that he should have explored the issues raised by the expert. Plaintiff acknowledges, however, that the ALJ listed fibromyalgia as a severe impairment; she submits that a proper diagnosis would lend more credibility to her.

The Court finds, after careful review, that the ALJ was under no obligation to further

develop the record, and that there was no error in this case. There are myriad medical records regarding plaintiff's physical and mental conditions. The ALJ accepted her claim that she suffered from fibromyalgia; therefore, there would be absolutely no benefit to further testing, and would not, in the Court's opinion serve to enhance her credibility. Clearly, the ALJ has no duty to further investigate this claim. Regarding an EMG- nerve conduction study on her ankle, there is evidence to conclude that her ankle condition had basically resolved, according to plaintiff's own report to the podiatrist in October of 2009. The ALJ fully evaluated the record before him, and found that her allegation of tarsal tunnel syndrome was not severe, based on sufficient medical evidence. It is also noted that although she testified that she used a cane for stabilization, no doctor had prescribed the use of a cane or other assistive device for her. And, several medical doctors noted that she had a normal gait. Therefore, the Court finds that the ALJ committed no error in not further investigating a claim of possible tarsal tunnel syndrome, given that he had reviewed the record and found that there was no severe impairment in that regard. In terms of the possibility of a somatoform disorder, while this was mentioned by the medical expert, there are no other references in the medical records regarding this possible diagnosis, nor was this a claim that was presented at the time of her application. An ALJ is not obligated to investigate a claim that was not presented by the claimant at the time an application for disability was made. Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003). Given that the medical expert acknowledged that this was beyond his area of expertise, his mere speculation at the hearing does not outweigh records from the treating physician, nurse practitioner, and examining psychologist that fail to even mention the possibility of this diagnosis. Because there is substantial evidence in the record as a whole to support the ALJ's decision, the Court finds that the ALJ did not err in failing to further develop this lengthy record, which was clearly adequate to make the decisions reached by

the ALJ.

Regarding the ALJ's credibility determination, plaintiff argues that the ALJ failed to undertake a Polaski-style credibility analysis. She asserts that he failed to consider her limitations about which she testified, and rejected her testimony without applying the proper credibility factors.

In terms of the credibility analysis, the ALJ must consider the subjective aspects of plaintiff's complaints pursuant to the agency's regulations, 20 C.F.R. §§ 404.1529 and 416.929, and within the framework set forth in Polaski. As long as the ALJ examines the Polaski factors and cites inconsistencies between plaintiff's subjective complaints and the record as a whole, the ALJ's credibility determination is entitled to deference. Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005).

Plaintiff contends that the ALJ ignored her solid work history. Additionally, she contends that he erred in finding that two doctors stated that she exaggerated her symptoms. Regarding her daily activities, it is her contention that the ALJ failed to take into account the fact that she could perform household tasks at a very slow rate, that the care her son required was minimal, that she was limited in how much she could drive and how many stops she would have to make, and that she could not attend her son's activities because of anxiety. She also has problems sleeping. She asserts that her daily activities are not inconsistent with her allegation of disability. It is also her contention that the ALJ did not take into account the side effects of medication and her statements that she was in a "brain fog," which prevents her from concentrating. She submits, moreover, that the ALJ improperly concluded that her mental health condition was stable on medication. She contends that her testimony is substantiated by the medical records of her treating source, Dr. Hopkins and the nurse practitioner, Ms. Wilczynski. She asserts that the ALJ

did not properly apply the credibility factors and did not properly weigh the objective medical evidence in determining her RFC.

The ALJ found that plaintiff's statements were not credible to the extent they were inconsistent with the RFC assessment. He noted that her daily activities were within the normal range, and that they were inconsistent with her allegation of being wholly disabled. The ALJ also found that the medical records did not support her allegations. He noted her history of varying diagnoses for a history of mental illness, but he found her condition to be stable on psychoactive medication, "despite on-going alcohol abuse." [Tr. 18]. The ALJ observed that two doctors, Drs. Hwang and Jarek, thought she was exaggerating her symptoms. The ALJ also noted that no x-rays or repeated examinations revealed any abnormalities that could be expected to produce the pain she described, and that physical examinations indicated normal range of motion throughout her body. Regarding her foot pain, he observed that the situation had appeared to resolve with treatment and that scheduled surgery was cancelled. He further noted that plaintiff had been non-compliant with recommended treatment regarding exercising.

A full review of the record indicates that the ALJ properly considered the Polaski factors, assessing plaintiff's credibility based on the record as a whole. Initially, while work history is one factor to be considered, it is clearly not the only factor, and the law does not require that an ALJ address every Polaski factor. The record indicates, moreover, that plaintiff apparently quit work for reasons other than ones involving her mental or physical health. The ALJ considered the medical records during the relevant time period, her statements, her subjective complaints, and functional limitations. Specifically regarding her physical complaints of pain in her joints, shoulders, back and neck, the ALJ considered the examination by Dr. Hwang, who observed normal range of motion in basically all her joints, normal straight leg

raises, normal gait, and the ability to bend easily. The doctor also noted that plaintiff appeared to be "very pleasant and happy." [Tr. 541]. The ALJ also considered the doctor's opinion that plaintiff could continue working as she had in the past. While the ALJ stated that Dr. Hwang indicated she "exaggerated her symptoms," [tr. 18], the doctor did not specifically use these words. It could be construed, however, from his examination and assessment of her symptoms, that her complaint of being totally disabled was not supported by his examination. In regards to Dr. Jarek, he noted that she had tenderness in many points of her body, but also noted that she "moans with lying down and sitting up and movement of her leg extremities, but I cannot appreciate any joint swelling, redness, warmth, nodules, or synovitis. Joint alignment and function remain good." [Tr. 638]. Again, while the ALJ stated that Dr. Jarek indicated plaintiff exaggerated her symptoms, it can be construed from a careful review of the medical records that this was, in fact, the doctor's impression, and that it was not error for the ALJ to conclude that a treating doctor found her behavior to be inconsistent with medical findings. An arguable deficiency in opinion-writing is not grounds for remand when the finding is supported by substantial evidence. See Draper v. Barnhart, 425 F.3d 1127. 1130 (8th Cir. 2005); Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001). It is also noted that although plaintiff used a cane as a stabilizer, several doctors observed that she had a normal gait. Further, the ALJ did credit plaintiff's contention that she had some limitations mentally due to spinal meningitis, but also properly noted this occurred in infancy and had not precluded her from working in the past. In terms of finding that plaintiff's mental condition was stable with medication, the ALJ noted that the nurse practitioner repeatedly noted that her mental condition was stable with medication, and that her primary problems were situational, including a bad marriage, and a chaotic family situation.

Regarding daily activities, the medical records and plaintiff's testimony support a finding that she was not wholly disabled. This includes the fact that she was the primary care-giver for her mother-in-law before her death; that she cared for her eleven-year old son; and that she performed the household chores, albeit slowly. Additionally, notations in the record indicate that she also took care of her sister, went on trips, including outside of the state, and did not attend her son's activities at least in part because he did not want her to. It would appear that plaintiff's testimony tended to minimize what she was capable of doing.

The Court has fully reviewed those records and finds that there is substantial evidence in the record as a whole to support the ALJ's conclusions regarding her mental health condition. The law is clear that situational depression is not necessarily disabling. While plaintiff apparently had family problems that caused her stress, anxiety, and difficulty getting along, there is nothing in the medical records as a whole to suggest that she suffered from a totally disabling mental impairment. Rather, the records indicate she responded to different medication regimens, sought mental health counseling to discuss her problems, and may not have stopped drinking despite the fact that medical professionals told her she needed to do so. Based on the record as a whole, it cannot be said that the ALJ did not fully and fairly assess plaintiff's credibility within the parameters of Polaski. It should also be mentioned that a review of plaintiff's testimony supports a conclusion that she was not fully credible. Therefore, the Court finds that the ALJ's credibility determination was sufficient, and is entitled to deference.

Turning to the weight given to the opinion of the treating physician, while a treating physician's opinions are ordinarily to be given substantial weight, they must be supported by medically acceptable clinical or diagnostic data, and must be consistent with substantial evidence in the record. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999); Strongson v. Barnhart, 361

F.3d 1066, 1070 (8th Cir. 2004). The ALJ may reject the opinion of any medical expert if it is inconsistent with the medical record as a whole. See Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995). In Prosch v. Apfel, 201 F.3d 1010 (8th Cir. 2000), the Eighth Circuit Court of Appeals discussed the weight to be given to the opinions of treating physicians, holding that the opinion of a treating physician is accorded special deference under the Social Security regulations. The Court has, however, upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments "are supported by better or more thorough medical evidence," Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996).

In terms of the weight the ALJ gave to medical opinions in the record, he indicated that he gave great weight to the opinion of the medical expert, Dr. Lorber. He stated that he did so because the doctor's opinion was "based on a review of the claimant's entire relevant medical history, the doctor testified in detail as to the reasoning behind his opinion and his opinion is consistent with the record as a whole." [Tr. 18]. He gave little weight to the opinion of Dr. Hopkins, finding that it was not supported by the doctor's treatment notes, the results of clinical or diagnostic testing, and was inconsistent with the record as a whole. He also gave little weight to the opinion of Ms. Wilczynski for the same reasons, noting additionally that a nurse practitioner is not an acceptable source of medical evidence.

A review of the record indicates that the ALJ relied on the record as a whole in rendering his decision, including medical evidence from various sources, as well as plaintiff's testimony. It is apparent that he thoroughly reviewed the record in great detail. He gave little weight to the findings of Dr. Hopkins on his assessment form, finding that these were not supported by the

evidence as a whole, were not supported by the doctor's own reports, and were not supported by objective clinical or laboratory diagnostic findings. The Court finds that there was substantial evidence in the record for the ALJ to have afforded little weight to the checklist forms, which had little or no elaboration. This is particularly true in terms of Dr. Hopkins' opinion that plaintiff was unable to understand and remember and carry out simple instructions or make simple work-related decisions, as well as his opinion that she could perform no work requiring fingering, handling, or feeling. There is nothing in the medical records, nor in her own testimony , to support a finding that she could not carry out simple instructions. Additionally, as noted by Dr. Lorber, there was no medical support for a complete prohibition of work requiring the use of the hands.

The Court has carefully reviewed the record, and finds that the ALJ properly assessed the medical records as a whole, and adopted the limitations he found credible, including non-exertional limitations based on her mental health problems. After careful review, the Court finds that there is substantial evidence in the record as a whole to support the ALJ's decision regarding the weight given to treating sources, including Dr. Hopkins and Nurse Practitioner Wilczynski. Additionally, while the ALJ did rely in part on the opinions of Dr. Lorber, the medical expert who appeared at the hearing telephonically, he did not rely on those opinions to the exclusion of other medical evidence in the record. Further, the expert's role was to assist in determining whether plaintiff's condition was medically equivalent to a listed impairment, and the ALJ afforded the proper weight to those opinions. The Court finds there is substantial evidence in the record to support the ALJ's decision regarding the weight given to treating and non-treating sources.

Based on the foregoing, the Court finds that there is substantial evidence in the record to support the ALJ's decision that plaintiff did not suffer from a disabling impairment, and that she

was not disabled under the Act.  <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir.  2006).

Accordingly, the decision of the Secretary should be affirmed.

It is hereby

ORDERED that the decision of the Secretary should be, and it is hereby, affirmed.

<u>/s/ James C. England</u>
 JAMES C. ENGLAND
United States Magistrate Judge

Date:<u>   3/23/12         </u>